IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., | : | CIVIL ACTION NO. 17- |
| MICHELLE McLOYD, | : | |
| Relator, | : | |
| v. | : | JURY TRIAL DEMANDED |
| TRC-OC, LLC/Trading as RECOVERY CENTERS OF AMERICA HOLDINGS, LLC | : | (FILED UNDER SEAL) |

**COMPLAINT**

This is an action by Plaintiff/Relator Michelle McLoyd against defendant Recovery Centers of America Holdings, LLC. ("RCA") to recover on behalf of the United States of America treble damages, restitution, and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law for causing the submission to the United States of claims to Medicaid for clinical programming services that were unreasonable, unnecessary, or unskilled, or that simply did not occur as RCA reported them to have occurred. These schemes included falsely stating the amount of reported clinical programming hours provided to patients, reporting as clinical various activities that were not clinical in nature, and falsely reporting that certain patient assessments were done when, in fact, they were not.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1345. The Court has supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a).

2. The Court may exercise personal jurisdiction over the defendant and venue is

appropriate in this Court under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because RCA transacts business in this District and caused the submission of false claims in this

**THE PARTIES**

3. Plaintiff is acting on behalf of the United States of America and the Department of Health and Human Services ("HHS"), which administers the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq. ("Medicaid").

4. Plaintiff is a resident of Pennsylvania. At all times relevant to this Complaint, she was employed by RCA as an Outcomes Supervisor in the RCA Corporate of Clinical Department.

5. Defendant RCA is a privately-held company and is among the nation's largest providers of recovery treatment services for patients with drug and alcohol addictions. Its corporate headquarters is located at 2701 Renaissance Blvd, King of Prussia, PA 19406.

6. RCA has centers in Pennsylvania, New Jersey, Maryland and Massachusetts, providing detoxification and residential drug and alcohol treatment. While RCA has engaged in extensive marketing of its services to those with private health insurance, its two facilities in Massachusetts, known as Boston Center for Addiction Treatment ("BCAT") and Westminster, at all times relevant to this Complaint, accepted low-income patients whose inpatient treatment was reimbursed by Medicaid and the Commonwealth of Massachusetts through its MassHealth Program.

7. In its marketing materials, RCA promotes itself to prospective patients as providing luxurious accommodations with original artwork and high end furniture and chauffeured Mercedes sedans for patients requiring transportation. RCA also advises prospective patients that it provides Wellness Programs, yoga, massage, Reiki, Tai Chi, psychiatric services

as needed, psychological services as needed, medication monitoring, discharge planning, guidance and support for re-entry into the community and alumni services.

8. The Chief Executive Officer of RCA, J. Brian O'Neill, is a Philadelphia-area real estate developer with no prior experience in health care or recovery services.

9. Within the past six months the Massachusetts Department of Health has opening investigations of RCA's facilities in that state following the deaths of patients there and the closing of facilities there after an August 25, 2017 Boston Globe article disclosing that patients were, among other things, trading medications with each other and staff in exchange for money and sex.

10. The averments of this Complaint are not based upon any previous public disclosures about the operations at RCA and plaintiff is the original source of the allegations herein.

## THE FALSE CLAIMS ACT

11. Under the False Claims Act, liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. §3729(a)(1)&(2).

12. Under the False Claims Act, "knowing" and "knowingly" mean that a person with respect to information:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required. 31 U.S.C. §3729(b).

13. The False Claims Act is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the government to pay a false or fraudulent claim for money.

14. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47,099, 47,103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## THE MEDICAID PROGRAM

15. Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. Funding for Medicaid is shared between the federal government and state governments.

16. Every Medicaid provider must agree to comply with all Medicaid requirements.

17. Under the 2010 Affordable Care Act (ACA), also known as "Obamacare," insurance providers (including Medicaid) must cover all basic aspects of drug and alcohol dependency recovery. While Medicaid covers substance abuse treatment, not all facilities accept Medicaid as a form of payment. After its initial startup, RCA had a greater capacity and number of beds in both of its Massachusetts facilities than it could fill through its private-insurer patients and it accepted low income Medicaid patients at that facility to maximize its revenue stream.

18. The ACA requires people to earn less than 133 percent of the federal poverty level (FPL) to be eligible for Medicaid. A person living above the poverty level may still be eligible for government insurance if they fall in the right income bracket.

19. Medicaid recipients don't have co-payments for addiction treatment in most states. For states that charge co-payments, there is an out-of-pocket maximum set for Medicaid recipients.

20. Medicaid covers all or part of the following services:

- Screenings
- Intervention
- Maintenance and craving medications
- Family counseling
- Inpatient care
- Long-term residential treatment
- Detox
- Outpatient visits
- Other mental health services

21. Certain provisions of Medicaid found at 42 U.S.C. §1396a(a)(68), and enacted under Section 6032 of the Deficit Reduction Act of 2005, and MassHealth regulations found at 130 CMR 450.205(F)(1), and 130 CMR 450.223(C)(7) require all health providers receiving more than $5 million annually in Medicaid reimbursements to certify in an Annual Attestation of Compliance Employee Education about Medicaid False Claims that it provides training to employees about false claims act and whistleblower provisions of state and federal law and contains such provisions in its employee handbooks.

22. Medicaid and MassHealth regulations also strictly regulate, among other things, the number of daily hours of clinical therapy that must be provided to inpatients receiving drug and alcohol rehabilitation services, the provision and timing of patient assessments, the provision and timing of detox services.

23. 105 CMR 164.000 has a requirement for reporting any type of sexual abuse that "occurs at or under circumstances connected with the program" and requires oral notification to the Department of Health immediately, and in writing the next day.

24. In order for a health care provider to obtain reimbursement from the Medicaid program for drug and alcohol rehabilitation services, it must comply with various state and federal requirements regarding the provision of those services and certify to Medicaid and MassHealth that it is providing such services in accordance with the program regulations.

25. The MassHealth regulations require that "[o]nce the patient receives medical clearance to participate, the licensee shall provide the patient with at least four hours of service programming each day. See also 164.133: Provision of Services.

26. The MassHealth regulations further require the maintenance of therapy provider progress notes, signed by the therapist, as to the date and type of therapy service provided. See 418.409: Recordkeeping Requirements.

27. Submission of the required electronic MassHealth UB-04 Form ("Form") for reimbursement carries a certification that the billing information as shown is "true, accurate and complete" and "the submittee did not knowingly or recklessly disregard or misrepresent or conceal material facts. The Form further provides that "For Medicaid purposes: The submittee understands that because payment and satisfaction of the claim will be from Federal and State funds, any false statements, documents or concealment of a material fact are subject to prosecution under applicable Federal and State law."

28. The MassHealth standard Form Provider Contract for Entities obligates health providers to provide service to furnish services and/or goods:

> A. "that conform to the requirements for such services and/or goods as set forth in MassHealth regulations; to furnish only those services and goods that qualify as medically necessary under MassHealth regulations; and to furnish services and/or goods that conform to the professionally recognized standards of health care within the Commonwealth for the applicable provider type and/or specialty type, or, if appropriate, that conform to the generally accepted standards within the Commonwealth for the trade;"

B. "to comply with all federal and state laws, regulations, and rules applicable to the Provider's participation in MassHealth, now existing or adopted during the term of this Provider Contract;" and

C. "that all information submitted to MassHealth on or with the Provider Application that has been incorporated by reference into this Provider Contract is true, accurate, and complete."

## FACTUAL ALLEGATIONS

29. While RCA was founded to take advantage of private insurance for dependency recovery, after its initial startup, RCA had a greater capacity and number of beds in both of its Massachusetts facilities than it could fill through its private-insurer patients. As a result, it accepted low income Medicaid patients at that facility to maximize its revenue stream. As it likely never intended to remain a Medicaid provider, it paid little, if any, attention to the Medicaid and MassHealth program requirements.

30. As the Outcomes Supervisor in the RCA Corporate of Clinical Department in King of Prussia and with prior rehabilitation therapy experience, Relator was deeply concerned by what she observed taking place at RCA.

31. For example, she learned that a senior manager had taken one patient out the facility, given her money with which the patient purchased drugs, placed her in an area hotel, and then visited her regularly for a period of time to have sex. Upon learning of this incident, Relator reported it to RCA compliance, her supervisor and she did so anonymously to a regulatory agency.

32. Relator also was concerned by RCA's failure to provide inpatients with the required number of clinical therapy hours required by MassHealth regulations.

33. In August 2017, Boston Globe writers visited the BCAT site and were given a tour by O'Neill who praised the luxurious surroundings, the high thread counts on the facility

bedlinens and the available chauffeur-driven black Mercedes sedans. At some point during the visit, it became apparent that the Boston Globe article was going to address problems and shortcomings at the facility.

34. After the Globe site visit but before the article appeared, O'Neill convened two auditing sessions in King of Prussia where she, along with approximately 20 other therapy providers, collectively reviewed a patient base of 200 patients at the BCAT facility for the amount of therapy being provided to each.

35. Relator observed that, in about 95% of the cases, the required therapy hours were not being met. At the sessions, RCA supervisors asked whether the hours would be met if non-reimbursable tasks, such as conversations with parents, were include in the total, and the group reported that the required hours still would not be met.

36. Relator attended a second "auditing meeting" and on information and belief, avers that hours for non-reimbursable tasks were added to the patient's therapy hours.

37. O'Neill was present at that session and expressed irritation that the required service hours were not being met.

38. Relator did not participate in billing activities for RCA but was aware that the sample billing template used by MassHealth obligated providers to comply with state and federal program requirements, including Medicaid, and to certify, under penalty of prosecution, that they were doing so.

39. In September 2017, RCA ceased to accept Mediciaid patients at the Boston facilities. That followed the August Boston Globe article that reported on operational problems at the area facilities involving patient drug use and two overdose deaths that resulted in investigations at the facilities.

40. From shortly after the opening of its Westminster and BCAT locations in 2016 through the termination of the MassHealth contract, RCA has engaged in a scheme to defraud Medicaid and the United States by submitting false claims for reimbursement and false statements that it is in compliance with Medicaid and Mass health program regulations governing recovery services.

41. RCA did not provide the patients with the required four hours of clinical programming.

42. RCA knew that it was not providing the required clinical hours and was aware that it did not have the capability to internally report on all clinical services provided.

43. RCA failed to comply with the requirement that it promptly report incidents of sexual abuse of patients to the State Department of Health.

44. Relator was aware that incidents of patients having sex with managers and unemployees were not being reported to state authorities. One incident involved a patient having sex with a groundskeeper at BCAT. Relator was told this incident wasn't reported because BCAT "forgot."

45. RCA failed to maintain accurate records of the provision of rehabilitation therapy to patients.

46. RCA failed to comply with the requirement that it provide all patients with a biopsychosocial assessment is that it must be completed within one week of admission. See 164.422(c).

47. RCA failed to comply with the directive that patients with two or more unsuccessful episodes of supervised withdrawal may not be admitted to detox, see

164.303(A)(3), or knowingly circumvented the rule by transferring the patient to another one of its facilities, at times in another state where the program regulations were different.

48. RCA committed fraud and submitted false claims to the government and submitted false records to the government when it certified that it was in compliance with the applicable regulations governing its provision of rehabilitation therapy services.

49. In or about September, 2017, after Relator reported to RCA Compliance, her direct supervisor and a state regulator about the manager checking a patient into a hotel for a week for sexual liasons, Relator's supervisor advised her that RCA was aware that "someone" had reported the incident to the State.

50. Shortly thereafter, on September 28, 2017, Relator requested from RCA various of its policies regarding therapy policies and any audit information showing these policies were being implemented.

51. RCA never responded to her request.

52. On October 13, 2017, Relator arrived at work and found her work area had been cleaned out. She was told by her supervisor that she was being terminated, effective immediately, because her job was being eliminated and as part of a cost-savings measure.

53. The rationale for Relator's termination is clearly pretexual. Relator's job is one that state regulations mandate be filled, and thus the position cannot be eliminated.

54. Moreover, the "cost-savings rationale" is prextual because to date, RCA continues to spend thousands of dollars monthly for such items as: sweat pants and t-shirts bearing the RCA logo and gift bags provided free of charge and the fleet of black Mercedes cars. In one particularly egregious example, O'Neill was unhappy with the comfort level of an order of high-end custom mattresses so he gave them away to staffers and replaced them with another brand.

55. In short, while freely accepting Medicaid dollars and spending money on wildly extravagant and unnecessary items, RCA was and has been unable to provide the level of clinical therapy services required of it. Thus, RCA has violated the False Claims Act and otherwise engaged in tortious and unlawful behavior.

**COUNT I – FALSE CLAIMS**

(31 U.S.C. § 3729(a)(1)(A); previously 31 U.S.C. 3729(a)(1))

56. Plaintiff repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

57. During the period from 2016 until the termination of its contract with MassHealth, defendant knowingly caused the presentation of false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicaid for therapy that was not provided or for activities that did not constitute clinical therapy.

58. By virtue of the false or fraudulent claims defendants knowingly caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II: FALSE STATEMENTS**

(31 U.S.C. § 3729(a)(1)(B); previously 31 U.S.C. 3729(a)(2))

59. Plaintiff repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

60. During the period from 2016 until the termination of its contract with MassHealth defendant knowingly made, used, or caused to be made or used false records or

statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

61. By virtue of the false records or statements defendants made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT III- WHISTLEBLOWER RETALIATION**

(31 U.S.C. §3730(h))

62. Plaintiff repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

63. RCA initiated an adverse employment action against Relator because she engaged in protected activity under the False Claims Act.

64. RCA knew or suspected that Relator had reported wrongdoing to state regulators and requested patient audit information because she was about to report Medicaid fraud to state and federal regulators.

**COUNT IV: UNJUST ENRICHMENT**

65. Plaintiff repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

66. During the period from 2016 until the termination of its contract with MassHealth, by virtue of causing claims to be submitted to Medicaid for clinical programming that was not provided, defendant obtained portions of inflated payments from the United States to which it was not entitled. Thus, defendant was unjustly enriched at the expense of the United States in such amounts to be determined at trial.

## COUNT V: CONVERSION

67. Plaintiff repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

68. During the 2016 until the termination of its contract with MassHealth, by virtue of the acts described, and specifically by causing the submission of claims and obtaining payment, directly or indirectly, for rehabilitation therapy services that were not provided, or that otherwise failed to meet Medicare/Medicaid criteria for coverage and payment, defendant has appropriated the United States' property for its own use and benefit, and exercised dominion of such property in defiance of the United States' rights.

69. Defendant is, therefore, liable to the United States for actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of the United States, demands and prays that judgment be entered in favor of her as follows:

1. On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2. On the Third Count for whistleblower retaliation, all statutory damages and relief, together with all such further relief as may be just and proper.

3. On the Fourth Count for unjust enrichment, for the damages sustained and/or amounts by which defendant was unjustly enriched or amounts which defendant retained from reimbursements paid by the United States to which it was not entitled, plus interest, costs, and expenses.

4. On the Fifth Count for conversion, for the damages sustained by the United States in an amount to be determined at trial, plus interest, costs, and expenses.

5. Award all statutorily- mandated attorney's fees to Relator's counsel, and other relief as may be required or authorized by law and in the interests of justice.

Respectfully submitted,

**ZARWIN, BAUM, DeVITO, KAPLAN SCHAER & TODDY, P.C.**

Date: November 15, 2017

David F. McComb
dfmccomb@zarwin.com
PA Bar Mo. 35754
Zachary A. Silverstein
zsilverstein@zarwin.com
1818 Market Street, 13th Floor
Philadelphia, PA 19103
Fax: 267-765-9665

Attorneys for Plaintiff